| | | |
|---|---|---|
| JEFFREY C. BALLHEIMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01393-SEB-DLP |
| | ) | |
| RYAN BATTS #525, | ) | |
| MATTHEW BURKS #562, | ) | |
| BLAYNE ROOT #524, | ) | |
| TOWN OF WHITESTOWN, INDIANA, | ) | |
| acting through its Metropolitan Police Dep't | ) | |
| and its Chief of Police, | ) | |
| DENNIS R. ANDERSON, Chief of Police, in | ) | |
| his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT (DKTS. 29, 31) AND
COLLATERAL MOTIONS (DKTS. 60, 61)**

Plaintiff Jeffrey Ballheimer ("Ballheimer") sued Defendants the town of

Whitestown, Indiana ("the Town"); Ryan Batts ("Batts"), Matthew Burks ("Burks"), and

Blayne Root ("Root"), three officers of the Town's police department (together, "the

Officers"); and Dennis Anderson ("Anderson"), chief of the Town's police department,

for violations of the Fourth and Fourteenth Amendments to the Constitution under 42

U.S.C. § 1983 as well as state-law torts and state constitutional violations.

The matter is now before the Court on the parties' crossmotions for summary

judgment and collateral motions. For the reasons given and to the extent stated below,

Defendants' motion for summary judgment is granted in part and denied in part.

Plaintiff's motion for summary judgment is denied. The collateral motions are denied.

## Background

The following facts are not genuinely disputed unless so noted. On the evening of July 7, 2016, the Officers were dispatched to respond to a report of an unconscious person in the parking lot of a local gas station and truck stop near the interstate outside the Town. At the gas station, the Officers found Ballheimer asleep in the driver's seat of his car. The car was parked properly in a parking spot and was not obstructing traffic. The engine was running but not in gear. Ballheimer had an open laptop computer on his lap as well as an extinguished cigarette butt and cold cigarette ashes; the driver's side window was partly open.

After a few unsuccessful attempts, King eventually awakened Ballheimer, who at first responded with angry, vulgar language before composing himself. Medics called by the Officers joined Ballheimer and the Officers at the scene soon thereafter. Ballheimer appeared "confused and lethargic," Compl. ¶ 8, though just how confused and lethargic is disputed. Ballheimer said that he had been on his way home and pulled over at the gas station because he felt very tired.

Root checked Ballheimer's pulse and asked him whether he had any medical problems, which he denied. The medics examined Ballheimer in their ambulance anyway. Ballheimer did not wish to be examined or treated by the medics and signed a medical release form as soon as the medics permitted him to do so. Ballheimer then exited the ambulance. The Officers observed Ballheimer staggering as he walked from his car to the ambulance and back again, unsteady on his feet. They immediately pulled him aside and began conducting field sobriety testing.

Burks had never before performed an impaired driver investigation or performed field sobriety testing. Burks nonetheless was able to determine that Ballheimer failed the horizontal gaze nystagmus test, the walk-and-turn test, and the one-legged-stand test. Ballheimer was breathalyzed but the test detected no alcohol on his breath. The Officers smelled neither alcohol nor marijuana on or around Ballheimer. Though Batts was certified in performing "drug recognition expert" tests, he did not perform one on Ballheimer.

The Officers advised Ballheimer of Indiana's implied-consent law, which the parties sometimes refer to as "reading him" or "offering him implied consent." Though the precise advisement is not in the record, the following example offered pursuant to the same statute appears typical:

> I have probable cause to believe that you have operated a vehicle while intoxicated. I must now offer you the opportunity to submit to a chemical test and inform you that your refusal to submit to a chemical test will result in a suspension of your driving privileges for one year. Will you now take a chemical test?

*Abney v. State*, 811 N.E.2d 415, 423 (Ind. Ct. App. 2004). *See* Ind. Code §§ 9-30-6-1 through 2. Eventually Batts and Burks transported Ballheimer in their police car to a nearby hospital for chemical testing. The Officers say Ballheimer consented to be transported; Ballheimer maintains that he acquiesced in the Officers' display of authority and had no real choice in the matter.

At the hospital, Ballheimer refused to consent to blood and urine screens until he was reminded that refusal would result in his license being suspended. Ballheimer signed

a consent form and a hospital technician drew his blood. He was then asked to provide a urine sample. It is undisputed that he did not provide a sample. It is hotly disputed whether that failure was a product of his malingering refusal, as the Officers say, or of his genuine inability to produce a specimen, as he says. Ballheimer initially consented to be catheterized but later revoked that consent as soon as the procedure was explained to him. There followed a substantial interval wherein Ballheimer "attempted" to provide a urine sample. As noted, it is disputed whether those attempts were shams or genuine.

Eventually Ballheimer collapsed in a hospital bathroom and became unresponsive to Batts's demands for a "yes or no" answer to the question of whether he would consent to be catheterized. Batts and Burks put Ballheimer in a chair. When he did not get up from the chair—again it is disputed whether through refusal or inability—he was told he was under arrest, handcuffed, and put in a wheelchair. Batts wheeled Ballheimer back outside to the police car they had arrived in. In Defendants' words, "[u]pon arriving at [Burks's] police car, [Ballheimer] did not get into the car as instructed, so [Batts] struck [Ballheimer] in his right thigh with his right knee and [Ballheimer] fell into the seat . . . ." Defs.' Br. Supp. 8.

Then, according to Ballheimer,

> I remember the officer coming around and sitting in the car
> and looking at me and saying, now we're going to charge you
> with resisting arrest, so you can't bond out until Monday.
> And then he shot me the most, like, messed up smile I've ever
> seen in my life. And, like, at that point, I was legitimately,
> like, terrified. So I—that's when I tried to get out of the
> situation by telling them—it somehow got translated into my
> needing medical help.

Ballheimer Dep. (Dkt. 30 Ex. 4) 110:15–24.

In the meantime, Burks had started to work on a search warrant application to present to the court seeking an order to compel production of Ballheimer's urine. Among other things, Burks's affidavit in support of the application stated that Ballheimer "had refused [to take a chemical test] by not responding." Dkt. 33 Ex. 2, at 2. Ballheimer contends that this was lie, since Burks had observed him consent to a blood draw and repeatedly attempt to provide a urine sample. The affidavit stated further that Burks was requesting "a search warrant to be issued to obtain and remove blood or other body fluid sample(s)" from Ballheimer but omitted that the Officers had already obtained a blood sample. *Id.* Ballheimer contends that this was an intentionally misleading omission. Batts read and approved Burks's affidavit before it was filed. The was warrant issued within the hour, authorizing the Officers "to obtain and remove blood or other body fluid sample(s)" from Ballheimer and "to use reasonable force to obtain such sample(s)." Dkt. 33 Ex. 1, at 1.

Batts returned Ballheimer from the police car to the hospital. Ballheimer was administered fluids intravenously for dehydration, and perhaps received some medication as well, and felt "substantially better." Ballheimer Dep. (Dkt. 30 Ex. 5) 123:12. Ballheimer was then given a "last chance" to urinate, though he still did not. *Id.* at 127:4.

> After I couldn't pee, they gave me a few minutes, and then they pretty much said, okay, well, you need to get cathetered now because you have to. And so instead of just arguing with them, I just complied, and I got up on the table, so they wouldn't force me because they've proven that they were going to do whatever they want. They're going to get it however they want to. And that's when the nurse told me to

pull down my pants, and then she grabbed my penis and
started pushing it in, and it was the worst pain I have ever felt
in my life. And she keeps yelling at me, you can't move. It's
kind of hard not to move when I'm feeling like I'm going to
vomit the whole time.

*Id.* at 128:4–17.

After his urine was successfully extracted, Ballheimer was transported to the

county jail, where he remained for two weeks. The chemical tests revealed the presence

of amphetamines, methamphetamine, benzodiazepines, and MDMA in Ballheimer's

system. Ballheimer later admitted having taken methamphetamine and Xanax on July 6,

2016, the day before his arrest, but denied taking any drug on July 7, 2016. After two

weeks in jail, Ballheimer was released on bond to a rehabilitation facility, where he

remained for five months.

Ballheimer's driver's license was suspended for one year by the Indiana Bureau of

Motor Vehicles but that suspension appears to have been vacated. On September 27,

2017, on a petition for judicial review, the state court (by the same judge who had

approved the warrant application on July 7, 2016) found that "probable cause did not

exist to believe [Ballheimer] had operated his vehicle in an impaired condition [on July 7,

2016,] and there was no authority to offer [Ballheimer] implied consent." Dkt. 33 Ex. 4,

at 5. Indiana public records reveal that pending criminal charges for operating a vehicle

while intoxicated, operating a vehicle with a controlled substance or its metabolite in the

body, public intoxication, and resisting law enforcement were dismissed shortly

thereafter. *See also* Dkt. 33 Ex. 6, at 1 (order of dismissal). No conviction appears to have

resulted and no other charges appear to be pending in connection with the July 7, 2016, incident.

This lawsuit was filed on May 2, 2017. Dkt. 1. Defendants' instant motion, Dkt. 29, seeks judgment on Ballheimer's case in its entirety; Ballheimer's motion, Dkt. 31, seeks judgment on liability only.

## Standard of Decision

Summary judgment is appropriate where there are no genuine disputes as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

The application of this standard varies with the burden of proof, a fundamental point that has escaped Ballheimer, who has not applied the standard correctly. Where the movant seeks judgment on a claim on which he would bear the burden of proof at trial, as does Ballheimer here, the movant

> must lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim. If the movant has failed to make this initial showing, the court is obligated to deny the motion.

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted). Under these circumstances, the movant may *not* rely on the nonmovants' purported failure to establish an element of their case, for they have no affirmative case to make. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

By contrast, where the movants seek judgment on a claim on which the nonmovant would bear the burden of proof, as do Defendants here, the movants are entitled to judgment as a matter of law if they can point to a failure of proof in the record such that no reasonable jury could find in the nonmovant's favor on one or more elements of his claims. *Id.*

The fact that crossmotions for summary judgment are before the Court does not alter these standards. *Price Waicukauski & Riley, LLC v. Murray*, 47 F. Supp. 3d 810, 813 (S.D. Ind. 2014) (Lawrence, J.). We decide each motion under the respectively applicable standards, viewing the facts in the light most favorable to the respective nonmovant. *Id.* (citing *Metro Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002)).

Again this point has apparently escaped the parties, who treat their briefs in opposition to summary judgment in favor of the other party largely identically to their briefs in support of summary judgment in their own favor. For example, Defendants attempt to resist Ballheimer's motion with the aid of a "Statement of Material Facts *Not* in Dispute," Defs.' Br. Opp. 1 (emphasis added), *contra* S.D. Ind. L.R. 56-1(b), and Ballheimer's opposition to Defendants' motion eschews any fact statement whatsoever. *Contra id.* But "'[t]he contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment . . . against it.'" *Hartman v. Dana Holding Corp.*, 978 F. Supp. 2d 957, 965 (N.D. Ind. 2013) (quoting *M.O. v. Ind. Dep't of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009)).

As the Seventh Circuit has held,

> The factual statement required by Local Rule 56.1 is not a mere formality. It follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial, and it substantially facilitates the district court's task in deciding whether a trial is indeed necessary. [Appellant's] failure to comply with the local rule was, accordingly, not a harmless technicality, but a mistake that our precedents (for good reason) have deemed fatal.

*Waldrige v. Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994).

There are also numerous instances in the parties' briefing of inferences impermissibly drawn in the respective movant's favor. For example, when the Officers say Ballheimer was actively resisting their authority, but Ballheimer says he was incapable of complying with their demands, the Officers will not be heard in their "Statement of Material Facts Not in Dispute" to claim that Ballheimer "refused" to comply. Defs.' Br. Supp. 7. That begs the very question of the case.

An exhaustive catalogue of the parties' imperfect compliance with Rule 56 and of the ways in which it frustrates decision on the merits is not warranted or useful. The point is that the Court is independently entitled to require "'strict compliance'" with its summary judgment procedures. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (quoting *Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004)). In our view, the procedural shortcomings are not so severe as to merit simply defaulting the parties' respective motions. But they do sharply exacerbate the considerable difficulties we have encountered in sorting out the substantive confusions evident in the parties' briefs, as we explain below.

## Analysis

We take up Ballheimer's federal claims before proceeding to his state claims. We find one genuine dispute of material fact precluding summary judgment and three issues incapable of intelligent decision on the parties' submissions. On the remaining claims and issues we conclude that Defendants are entitled to judgment.

## I. SECTION 1983

42 U.S.C. § 1983 imposes liability on "[e]very person" who "subjects, or causes to be subjected" another to the deprivation of federal rights under color of state law.

The text of the statute notwithstanding, qualified immunity shields public officials exercising their discretionary powers and sued in their personal capacities—as the Officers here—from the burdens of litigation under Section 1983 unless their conduct violated "a clearly established . . . constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The inquiry has two parts: (1) whether a defendant violated a constitutional right and (2) whether the right was clearly established at the time of the violation. *Id.* (citing *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012)). These questions may be addressed in either order. *Id.* (citing *McComas*, 673 F.3d at 725). "If a defendant asserts that she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim." *Archer v. Chisholm*, 191 F. Supp. 3d 932, 943 (E.D. Wis. 2016) (citing *Betker*, 692 F.3d at 860).

Anderson is sued in his official capacity, which "represents 'only another way of pleading an action against an entity of which an officer is an agent'"—in this case, the

Town. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008) (McKinney, J.) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Accordingly, we treat Ballheimer's claims against Anderson as running against the Town.

We begin with Ballheimer's claims against the Officers before proceeding to his claims against Anderson and the Town.

## A. Fourth (and Fourteenth) Amendment Claims Against the Officers

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness under all the circumstances, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), limned by balancing the public and private interests at stake in a given state intrusion into personal privacy. *United States v. Hensley*, 469 U.S. 221, 228 (1985).

In this case, Ballheimer challenges as unreasonable (1) his detention in the gas station parking lot for field sobriety testing; (2) his arrest by the Officers; (3) the justification of the search for his bodily fluids; and (4) the manner in which that search was conducted, *viz.* forced catheterization. The parties' briefs collapse the first and second challenges, and the third and fourth are better taken together as well. Ballheimer additionally or alternatively frames his fourth challenge as a claim under the Due Process Clause of the Fourteenth Amendment, but the applicability of the Fourth Amendment precludes resort to the Fourteenth. *Lester v. City of Chicago*, 930 F.2d 706, 710–11 (7th Cir. 1987); *Spiller v. District of Columbia*, 302 F. Supp. 3d 240, 245–46 (D.D.C. 2018) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Finally, Ballheimer's claim for being

kicked or kneed by Batts appears to be brought only as state-law battery, not as a freestanding Fourth Amendment claim. *See* Pl.'s Br. Opp. 24–25. For ease of analysis, we therefore organize Ballheimer's Fourth Amendment claims as follows: (1) false arrest and (2) and unreasonable search.

## 1. False Arrest

For the purposes of analyzing Fourth Amendment seizures, there are three types of police-citizen interactions. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982)). Within this framework, progressively deeper intrusions into privacy require progressively weightier justifications. *See id.* Consensual encounters, over which police exercise no control and which are therefore not Fourth Amendment seizures at all, require no particularized suspicion. *Id.* Investigatory stops, or *Terry* stops, which are limited to brief, nonintrusive detentions, require reasonable suspicion of criminality supported by specific, articulable facts. *Id.* Full arrests, subjecting the arrestee to a litany of intrusions, *see Utah v. Streiff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting), require probable cause to believe the person is committing or has committed a crime. *Johnson*, 910 F.2d at 1508.

The proper preliminary characterization of each police-citizen encounter is thus critical because it defines the quantum of suspicion necessary to justify police conduct at a particular moment. *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). Nonseizures may ripen into seizures, *see Abbott v. Sangamon County*, 705 F.3d 706, 719–20 (7th Cir. 2013), and *Terry* stops may ripen into arrests, *see Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014), so long as the seizure is supported by a sufficient

quantum of suspicion. Because such sufficiency is tested by viewing "the facts and circumstances within [a police officer's] knowledge" "at the moment the decision [to seize] was made," disregarding later acquired information, *Qian v. Kautz*, 168 F.3d 949, 953–54 (7th Cir. 1999), it is just as critical to determine when in the timeline of events a particular characterization attaches.

The problems with the parties' briefing on this claim are two. First, the parties have not adhered to, applied, or even cited to this framework and consequently are not scrupulous in identifying precisely when or to what degree Ballheimer was seized. Instead, the parties concentrate on whether the Officers had probable cause to seize Ballheimer in the gas station parking lot after he had been released by on-scene medics without explaining why this is the relevant inquiry. (Ballheimer also argues that there was no probable cause to arrest him for "refusing" chemical testing at the hospital, Pl.'s Br. Supp. 14, but such refusal is not a crime, and not the reason announced by the Officers when they were arresting him at the hospital. *See* Dkt. 30 Ex. 5, at 95 ("Incident Report" noting three offenses for which Ballheimer arrested).) Notably, in all three of their briefs to address the issue, Dkts. 30, 37, 54, the Officers restrict themselves to this question of probable cause without any argument that *Terry* supplies the appropriate standard for field sobriety testing. *See Rogala v. District of Columbia*, 161 F.3d 44, 52 (D.C. Cir. 1998) (citing state cases). Compounding the confusion, the parties cite indiscriminately to cases applying *Terry* or reciting its reasonable-suspicion standard while arguing in terms

of probable cause.[1] *See, e.g.,* Defs.' Br. Supp. 16.

Likely the parties frame the question in this way because it was the only question before the state court when it ruled that the Officers did not have probable cause, as required by Indiana's implied consent statute, to offer Ballheimer the choice between suspension of his driver's license and chemical testing. But that offer is without apparent Fourth Amendment significance (at least the parties have nowhere explained its significance) except collaterally, insofar as the field sobriety testing here included breathalyzer testing, a search which must be "supported by probable cause to believe that the test will yield evidence of a crime." *Seizer v. City of Chicago*, 762 F.3d 647, 654 (7th Cir. 2014). But Ballheimer has not raised an independent claim for wrongful breathalyzation.

We are thus unable to form any clear conception of who says that Ballheimer was subject to what seizure at what time supported (or not) by what quantum of suspicion. We cannot construct the parties' arguments for them, and taking the parties' arguments as given would require decision on a seemingly fictitious Fourth Amendment problem. We deem neither course acceptable. Accordingly, for so much of Ballheimer's lawsuit as depends exclusively on the lawfulness of his seizure or seizures by the Officers, the

---

[1] And even the probable cause discussions are not free of fundamental confusion. *See, e.g.,* Defs.' Reply Br. 2 ("Ballheimer analyzes the Defendant Officers' probable cause based on criminal law probable cause standards. [?] However, in the civil action realm, [?] all that is required for the defendant to avoid judgment is probable cause for *any* arrest, even uncharged crimes. *Devenpeck v. Alford*, 543 U.S. 146 (2004). Significantly, in a civil action, probable cause requires only a *probability or substantial chance* of criminal activity, not an actual showing of such activity. [?] *Eaton v. State*, 889 N.E.2d 297 (Ind. 2008). [?]"

parties' motions are denied without prejudice to refiling. We emphasize that these denials are *not* because the question is appropriate for trial; these denials are because we cannot decide what the parties contend to be the salient legal issue and whether the question is appropriate for trial on the basis of the parties' submissions.

Second, the Officers' focus on probable cause comes at the expense of any argument on "arguable probable cause" as would entitle them to qualified immunity on the Fourth Amendment false arrest claim. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). *Compare* Defs.' Br. Supp. 13 ("If probable cause existed to arrest Plaintiff, the Defendants are entitled to qualified immunity and Plaintiff's claims fail.") (citing *Pierson v. Ray*, 386 U.S. 547, 557 (1967), *abrogated by Harlow v. Fitzgerald*, 457 U.S. 800, 815–16 (1982)). To state the obvious, "a determination of actual probable cause is separate and distinct from a determination of what is sometimes referred to as 'arguable probable cause' for qualified immunity purposes." *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015).

It is Ballheimer's burden to overcome the qualified immunity defense once raised. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). Arguably, the Officers do not "raise" the defense merely by incanting the words "qualified immunity" and citing to an incorrect standard. Had Ballheimer made this argument, we might have been sympathetic to it. But he has not. Instead, throughout his briefs, Ballheimer simply has nothing at all to say on qualified immunity for the Fourth Amendment false arrest claim. We conclude accordingly that Ballheimer has not carried his burden on this score and the Officers are therefore entitled to immunity.

## 2. *Unlawful Search*

Under the Fourth Amendment, warrantless searches are *per se* unreasonable, subject to a few well delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). The warrant requirement applies with full force "'where [surgical] intrusions into the human body are concerned[,]'" *Winston v. Lee*, 470 U.S. 753, 761 (1985) (quoting *Schmerber v. California*, 384 U.S. 757, 770 (1966)), or more specifically in the case of blood draws, where there is "a compelled physical intrusion beneath [a person's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). There is no conceivable justification for treating differently a compelled physical intrusion beneath a person's skin and into his urethra to obtain a sample of his urine for use as evidence in a criminal investigation.

The catheterization challenged here may have been unlawful on one or more theories, which we address in turn below.

### a. *No Warrant Plus Exigent Circumstances*

Exigent circumstances furnish one exception to the warrant requirement. *Schmerber*, 384 U.S. at 770 (1966). In the context of operating a vehicle while intoxicated and similar crimes, the natural dissipation of intoxicating substances in a person's body may, but does not necessarily, present a Fourth Amendment exigency. *McNeely*, 569 U.S. at 156. The question is taken case by case. *Id.*

In this case, it is beyond dispute that no exigent circumstances confronted the Officers at the time of Ballheimer's catheterization. (Indeed, the phrase does not appear

once in Defendants' briefs.) Ballheimer had already provided a blood sample by consent, so any genuine exigency stemming from the danger of dissipation of evidence was mooted. *Elliott v. Sheriff*, 686 F. Supp. 2d 840, 856 (S.D. Ind. 2010) (Lawrence, J.). There is no argument that urine may contain evidence of intoxication that blood does not, still less that such evidence was in genuine danger of dissipation unless a warrantless catheterization could be performed on Ballheimer. The Officers therefore required a warrant for the catheterization.

### b.  *No Valid Warrant Because Warrant Application False*

Acquire a warrant they did. But "[i]f police officers obtain a search warrant by deliberately or recklessly providing the issuing court with false, material information, the search warrant is invalid." *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). Such dishonesty disentitles police officers from claiming any reasonable or good-faith reliance on an instrument they knew by hypothesis to be wrongfully procured. *Snider v. Pekny*, 899 F. Supp. 2d 798, 817 (N.D. Ind. 2012) (citing *United States v. Leon*, 468 U.S. 897, 926 (1984); *Jones v. Wilhelm*, 425 F.3d 455, 465 (7th Cir. 2005)). *See Junkert v. Massey*, 610 F.3d 364, 369 (7th Cir. 2010) (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)) (no distinction between *Leon* and qualified immunity analyses).

In this case, a reasonable jury could, but would not be required to, conclude that the warrant was worthless for this reason. Specifically, the jury could reasonably find that, in light of Ballheimer's consent to the blood draw, it was a knowing lie for Burks to state that Ballheimer "refused" chemical testing "by not responding[,]" Dkt. 33 Ex. 2, at 2, and intentionally or recklessly misleading for Burks to omit the blood draw from his

affidavit. Similarly, depending principally on its resolution of whether Ballheimer refused (as the Officers say) or was unable (as he says) to urinate, the jury could reasonably find that Burks knowingly lied when he stated in his affidavit that Ballheimer had "refused."

If so, qualified immunity is unavailable to the Officers. The conduct here happened in 2016. That warrantless nonexigent blood draws violate the Fourth Amendment was clearly established no later than *McNeely* in 2013. That a warrant is bad if falsely procured was clearly established no later than *Franks v. Delaware*, 438 U.S. 154 (1978). That a police officer cannot rely on a falsely procured warrant was established no later than *Malley*'s 1986 adoption of *Leon*'s standard for Section 1983 actions. *See Junkert*, 610 F.3d at 369.

The sole remaining question is whether any reasonable officer could think the distinction between blood draws and catheterizations—or more specifically, the distinction between veins and urethras—makes a constitutional difference. *Hope v. Pelzer*, 536 U.S. 730, 742–43 (2002). We conclude she could not. First, in 1985 *Winston* established a warrant plus probable cause as "the threshold requirements" for any intrusive medical search of a person's body. 470 U.S. at 760–61 (citing *Schmerber*, 384 U.S. at 768–770). *See also Elliott*, 686 F. Supp. 2d at 863 ("This case falls into the 'obvious' category."). Further, once shoving a needle into a man's arm is clearly established as illegal under given conditions, *McNeely*, 569 U.S. at 148, no reasonable officer would think that shoving a tube up a man's urethra is legal under the same conditions. Indeed, if there is any constitutional difference between probing veins (which

may be done at the forearm) and urethras (which necessarily requires intruding into a person's genitals), it does not operate in the Officers' favor.

The Officers rely on *Sparks v. Stutler*, 71 F.3d 259 (7th Cir. 1995), but that case is clearly inapposite. It dealt expressly with "the use of invasive medical procedures *in prison . . . .*" *Id.* at 262 (emphasis added). No reasonable officer could think that "free citizens in an open society," even arrestees, are subject to the same control by police as wardens exercise over prisoners. *Wolff v. McDonnell*, 418 U.S. 539, 560 (1974). *See Sullivan v. Bornemann*, 384 F.3d 372, 376–77 (7th Cir. 2004) (approving catheterization of arrestee under Fourth Amendment where arrestee had "high [blood] alcohol level" because "not ordered by law enforcement officers to establish [arrestee's] guilt or innocence" but "solely to assure [arrestee's] medical well-being before he was transported to the county jail").

Similarly, *Lockard v. City of Lawrenceburg*, 815 F. Supp. 2d 1034 (S.D. Ind. 2011) (Pratt, J.), is obviously distinguishable on the basis of the unchallenged warrant in that case. Here, the jury could reasonably find the warrant was wrongfully procured. Accordingly, genuine fact disputes preclude grant of qualified immunity on this claim.

We conclude by rejecting the Officers' argument that, because they "did not perform or physically participate" in the catheterization of Ballheimer, they cannot be held liable for it. Defs.' Br. Supp. 27. "[O]nly those who participate in or cause a constitutional deprivation are subject to Section 1983 liability." *Elliott*, 686 F. Supp. 2d at 860 (citing *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998)). Here, a jury could reasonably find that Burks prepared a false warrant application; Batts approved it; and

Root, knowing all the predicate facts, permitted Burks and Batts to proceed. That is

sufficient to withstand summary judgment. *See Smith v. Rowe*, 761 F.2d 360, 369 (7th

Cir. 1985) (citing *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)) (Section 1983

liability may result where constitutional deprivation occurs at defendant's direction or

with defendant's knowledge and consent); *Elliott*, 686 F. Supp. 2d at 861.

*c. No Warrant Because Catheterization Outside Scope*

Additionally, Ballheimer charges that, even assuming the warrant was valid, the

Officers exceeded its scope such that the catheterization specifically was warrantless. The

warrant authorized the Officers "to obtain and remove blood *or* other body fluid

sample(s)" from Ballheimer, Dkt. 33 Ex. 1, at 1 (emphasis added), but the Officers

obtained blood *and* urine samples from Ballheimer. As this Court has explained,

> The Fourth Amendment provides that "no Warrants shall
> issue, but upon probable cause . . . particularly describing the
> place to be searched, and the persons or things to be seized."
> U.S. Const. amend. IV. "If the scope of the search exceeds
> that permitted by the terms of a validly issued warrant or the
> character of the relevant exception from the warrant
> requirement, the subsequent seizure is unconstitutional
> without more." *Horton v. California*, 496 U.S. 128, 140
> (1990).

*Elliott*, 686 F. Supp. 2d at 856.

*Elliott* held that police officers exceeded the scope of a warrant authorizing them

to obtain "a sample of Plaintiff's blood or urine . . . by requiring Plaintiff to give a urine

sample after Plaintiff had already provided a blood sample." *Id.* There, however, both

blood and urine samples were taken under the warrant. *See id.* at 851. Here, by contrast,

the blood sample had already been taken by consent at the time the warrant issued. Even

if the warrant's "or" was exclusive, the Officers complied with it by taking only Ballheimer's urine sample under its auspices.

At minimum, moreover, and notwithstanding Ballheimer's insistence to the contrary, "or" does not always mean "or"; sometimes it means "and." The ambiguity of exclusive and inclusive "or" is well known to the law. *See De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956) (citing *United States v. Fisk*, 70 U.S. 445 (1865)). We add that, had the Officers raised qualified immunity against this theory of liability (they have not), it appears that nothing in the warrant would so unambiguously exclude the possibility of taking both blood and urine samples as to disentitle the Officers from relying on such a construction of their own authorization. *See Messerschmidt v. Millender*, 565 U.S. 535, 546–48 (2012).

### d. No Valid Warrant Because No Probable Cause

In response to Defendants' motion for summary judgment, Ballheimer also argues that, for the same reasons that his arrest was unsupported by probable cause, so too was the search warrant. Pl.'s Br. Opp. 13–14. But we cannot intelligently decide this question on the parties' submissions, as explained above. Though the Officers have again failed to raise qualified immunity against this theory of liability, any future efforts by Ballheimer to hold the Officers liable for conduct under a warrant issued without probable cause would have to overcome the hurdle of showing that the warrant was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley*, 475 U.S. at 344 (citing *Leon*, 468 U.S. at 923).

### e. With a Valid Warrant

Finally, argues Ballheimer, again assuming the warrant was valid and the Officers' conduct did not exceed its scope, he may still recover for the Officers' unreasonable execution of it, *viz.* by forced catheterization. As a general matter, the constitutionality of invasive medical procedures conducted under court order for the purposes of criminal investigation is tested under the "*Schmerber* balancing test." *Winston*, 470 U.S. at 763. *See, e.g., United States v. Husband*, 226 F.3d 626, 631 (7th Cir. 2000); *Elliott*, 686 F. Supp. 2d at 859. Neither party cites *Winston* at all and the only citations to *Schmerber* appear in page-long block quotations from this Court's opinions in *Elliott* and *Lockard*.

Again, we will not construct the parties' arguments for them, but we are equally unwilling to purport to decide a question of law without any discussion by the parties of the controlling cases. Accordingly, as to the lawfulness of the catheterization here assuming the warrant was valid and the Officers' conduct did not except its scope, the parties' motions are denied without prejudice to refiling. As above, these denials are *not* because the question is appropriate for trial; these denials are because we cannot decide whether the question is appropriate for trial on the basis of the parties' submissions.

## B. Municipal Liability

Under Section 1983, a municipality such as the Town is liable for its own constitutional torts but not for those of its employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). The tort is the municipality's own if it was caused by an express municipal policy, the decision of a final municipal policymaker, or municipal custom carrying the force of law. *Wragg v. Village of Thornton*, 604 F.3d 464, 467–68 (7th Cir. 2010).

The nub of Ballheimer's *Monell* claim appears to be that the Town, through Anderson, its police chief, "'was aware' that Batts routinely used forced catheterizations" but failed to stop him from doing so, Pl.'s Br. Opp. 22 (quoting Batts Dep. (Dkt. 33 Ex. 7) 82:7), thus constituting evidence of a municipal custom with force of law or, in the alternative, amounting to a failure to train the Town's police which was deliberately indifferent to the constitutional rights of those with whom the Town's police come into contact. *See City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989).

Preliminarily, Ballheimer's argument in favor of summary judgment simply disregards Anderson's testimony that he was "not aware that catheterizations, period, were being utilized in Boone County until [this lawsuit was filed]," Anderson Dep. (Dkt. 30 Ex. 6) 35:6–8, and asserts but fails to explain the materiality of Anderson's awareness in the absence of any argument that Anderson is the Town's final policymaker on police procedures and training.

More fundamentally, however, Ballheimer has not identified with any precision *what* constitutional torts the Town is alleged to have caused. As outlined above, Ballheimer's catheterization may have been unlawful under one or several theories. It is therefore not enough to say that the Town had a policy that caused the Officers' conduct in the abstract. Did the Town's policy cause a catheterization under a falsely procured warrant? —under a valid warrant but in excess of its scope? —under a warrant procured without probable cause? —under a valid warrant but nonetheless unlawful under *Schmerber*? As noted above, Ballheimer's block-quote from *Elliott* does not come close to establishing the catheterization here as unlawful, assuming the warrant was good and

the Officers acted within its scope. And none of Ballheimer's *Monell* arguments relate the Town's purported policy to actually or effectively warrantless catheterizations.

Defendants fare no better. Defendants too simply disregard unfavorable record evidence, pointing exclusively to Anderson's plea of ignorance (which they include in their "Statement[s] of Material Facts Not in Dispute," Defs.' Br. Supp. 3; Defs.' Br. Opp. 10) and ignoring Batts's contrary testimony. Further, neither in their brief in support of their own motion nor in their opposition to Ballheimer's motion do Defendants raise the argument that Anderson was not the final municipal policymaker on police training; that argument appears for the first time in their reply brief in support of their own motion, Defs.' Reply Br. 15, *and even then* in response to Ballheimer's "custom" arguments— precisely *not* the theory of liability for which Anderson's status as a final policymaker is in issue.

Most importantly, Defendants' chief argument in opposition to Ballheimer's *Monell* claim is a complete nonstarter: "Contrary to Plaintiff's claims, there were no policies and procedures in place with regards to these issues. If this claim is recognized, it does not rise to the level of a constitutional violation and/or there is no evidence in support of it." Defs.' Br. Supp. 32. And again: "The undisputed evidence is that there were no policies and procedures in place with regard to the catheterization issue." Defs.' Br. Opp. 27. Rejecting this argument does not require

> breaking new ground in this area; to the contrary, [the Seventh Circuit] has recognized these principles for years. In *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990), [the court] observed that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be

> actionable." *Id.* at 543 (citing *Avery v. Cnty. of Burke*, 660
> F.2d 111, 114 (4th Cir. 1981); *Murray v. City of Chicago*, 634
> F.2d 365, 366–67 (7th Cir. 1980)). In the same vein, [the
> court] said in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d
> 293 (7th Cir. 2010), that "in situations where rules or
> regulations are required to remedy a potentially dangerous
> practice, the County's failure to make a policy is also
> actionable." *Id.* at 303; *see also King v. Kramer*, 680 F.3d
> 1013, 1021 (7th Cir. 2012) (where municipality has "actual or
> constructive knowledge that its agents will probably violate
> constitutional rights, it may not adopt a policy of inaction").

*Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017) (*en banc*). *Accord id.* at

383 (Sykes, J., dissenting) ("A municipality's failure to have a formal policy in place on a

particular subject may represent its intentional decision not to have such a policy—that is,

a policy *not* to have a policy—and that institutional choice may in appropriate

circumstances form the basis of a *Monell* claim.").

For the third time, we deem the parties' submissions on this question insufficient

to present a decidable issue. Their motions are therefore denied. For the third time, we

emphasize that these denials are *not* because the question is appropriate for trial; these

denials are because we cannot decide whether the question is appropriate for trial.

## II. STATE-LAW CLAIMS

Under the Indiana Tort Claims Act (ITCA), a governmental defendant is

personally immune from liability for acts or omissions within the scope of her

employment. Ind. Code § 34-13-3-5(b). Accordingly, only the Town may be liable for

Ballheimer's state-law claims on a theory of *respondeat superior*.

Both in support of his own motion and in opposition to the Town's, Ballheimer

appears to have completely abandoned his state constitutional, defamation, and "inflicting

physical injury and mental anguish" claims, raised under Counts II and III of the complaint. Compl., at 7–9. He nowhere offers legal argument for them, supports them with any record citations, or even outlines their basic contours. Accordingly, Defendants' motion is granted as to these claims.

As to Ballheimer's state-law false arrest and false imprisonment claims, he argues again that he was arrested without probable cause, and notes that false arrest is outside the scope of the governmental immunity conferred by the ITCA. Ind. Code § 34-13-3-3(8). This claim too fails, notwithstanding the outstanding probable-cause issue. Under Indiana law, "a plaintiff has the burden of showing that his arrest was 'false' and that the arresting officers did not act in good faith." *Turner v. Sheriff*, 94 F. Supp. 2d 966, 995 (S.D. Ind. 2000) (mag. j. op.) (citations omitted). "Good faith has a subjective and an objective component: a defendant officer must actually have had a good faith belief that he had lawful authority to arrest the plaintiff and his belief (not the arrest) must have been objectively reasonable." *Id.* (citations omitted).

In contrast to Ballheimer's Fourth Amendment false arrest claim, here the Town has raised and stated the correct standard. *See* Defs' Br. Supp. 34–35. Ballheimer for his part is entirely silent on the good-faith defense. Because he bears the burden to show its absence but has failed to cite any evidence upon which a jury could so find, the Town is entitled to judgment on this claim.

Finally, Ballheimer's battery claim fails for similar reasons. He twice notes that the Town is not immune to claims that the Officers used excessive force, Pl.'s Br Supp. 19; Pl.'s Br. Opp. 25, but has entirely omitted any discussion of battery under Indiana tort

law. Obviously, to state a defendant is not immune to a particular claim is very far from showing that a jury must or could find in a plaintiff's favor on that claim. Because Ballheimer has failed to carry his burden in opposition to summary judgment, the Town's motion is granted as to the battery claim.

## Conclusion and Order

For the reasons given above:

1. Plaintiff's motion for summary judgment, Dkt. 31, is DENIED, and Defendants' motion for summary judgment, Dkt. 29, is DENIED IN PART, on the following terms:

   a. Both motions are DENIED WITHOUT PREJUDICE TO REFILING for failure to present a decidable issue as to the following issues: the lawfulness of Defendants' seizure or seizures of Plaintiff; and *Monell* liability. The Court invites renewed motions on these issues provided they are supported with cogent, coherent briefs addressing the points raised in this opinion.

   b. Both motions are DENIED WITH PREJUDICE TO REFILING because of the presence of a genuine dispute of material fact as to the following issue: whether Defendants deliberately or recklessly provided the court issuing the warrant with false, material information.

   c. Plaintiff's motion is otherwise DENIED WITH PREJUDICE TO REFILING.

2. Defendants' motion for summary judgment, Dkt. 29, is GRANTED IN PART, being granted as to the following claims: Fourth Amendment false arrest; Fourteenth Amendment; and all state-law claims.

3. Plaintiff's motion to strike Defendants' surreply, Dkt. 61, is DENIED.

4. Defendant's motion for oral argument, Dkt. 60, is DENIED.

IT IS SO ORDERED.


Date: _____3/18/2019_____        _Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William W. Barrett
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
wbarrett@wbwlawyers.com

Stephen G. Gray
ATTORNEY AT LAW
misstuffy@aol.com

Daniel J. Paul
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
dpaul@wbwlawyers.com

Todd L. Sallee
TODD SALLEE LAW
toddsalleelaw@yahoo.com