UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFFREY C. BALLHEIMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01393-SEB-DLP |
| | ) | |
| RYAN BATTS #525, | ) | |
| MATTHEW BURKS #562, | ) | |
| BLAYNE ROOT #524, | ) | |
| TOWN OF WHITESTOWN, INDIANA | ) | |
| acting through its Metropolitan Police Dept. | ) | |
| and its Chief of Police, | ) | |
| DENNIS R. ANDERSON Chief of Police, in | ) | |
| his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiff Jeffrey Ballheimer ("Ballheimer") has sued Defendants the Town of
Whitestown, Indiana ("the Town"); Ryan Batts, Matthew Burks, and Blayne Root, three
officers of the Town's police department (together, "the Officers"); and Dennis
Anderson, chief of the Town's police department, for violations of the Fourth and
Fourteenth Amendments to the Constitution under 42 U.S.C. § 1983 as well as state-law
torts and state constitutional violations.

The matter is now before the Court on the parties' cross-motions for summary
judgment. For the reasons detailed below, we **deny** Plaintiff's Motion for Summary
Judgment and deny **in part and grant in part** Defendant's Motion for Summary
Judgment.

## Background

### I.    Facts

The following facts are not genuinely disputed unless so noted. On the evening of July 7, 2016, the Officers were dispatched to respond to a report of an unconscious person in the parking lot of a local gas station and truck stop near the interstate which passes by outside the Town. At the gas station, the Officers found Ballheimer asleep in the driver's seat of his car. The car was properly parked in a designated parking spot and was not obstructing traffic. The engine was running but not in gear. Ballheimer had an open laptop computer on his lap; an extinguished cigarette butt and cold cigarette ashes were visible; the driver's side window was partly open.

After a few unsuccessful attempts to rouse Ballheimer, Officer King eventually awakened him, who responded at first with angry, vulgar language before composing himself. Medics called by the Officers arrived soon thereafter at the scene. Ballheimer's eyes were observed to be bloodshot and glassy, his speech was slurred, and he appeared "confused and lethargic," Compl. ¶ 8, though just how confused and lethargic is disputed. Ballheimer said that he had been on his way home and pulled over at the gas station because he felt very tired.

Root checked Ballheimer's pulse and asked him whether he had any medical problems, which Ballheimer denied having. The medics nonetheless examined Ballheimer in their ambulances. Because Ballheimer did not wish to be examined or treated by the medics, he signed a medical release form as soon as the medics permitted him to do so. Ballheimer then exited the ambulance. The Officers observed Ballheimer

staggering as he walked both from his car to the ambulance and back again, so unsteady was he on his feet. These observations prompted them to immediately pull him aside and to conduct field sobriety testing.

Officer Burks reportedly had never previously performed an impaired driver investigation or a field sobriety test. Officer Burks nonetheless was able to determine that Ballheimer had failed the horizontal gaze nystagmus test, the walk-and-turn test, and the one-legged-stand test. Ballheimer was also breathalyzed but that test detected no alcohol on his breath. The Officers have testified that they smelled neither alcohol nor marijuana on or around Ballheimer. Though Officer Batts was certified to perform "drug recognition expert" tests, he did not perform such a test on Ballheimer.

The Officers advised Ballheimer of Indiana's implied-consent law. Though the precise words included in that advisement are not in the record, the following example based on the same statute was proffered as typical:

> I have probable cause to believe that you have operated a vehicle while intoxicated. I must now offer you the opportunity to submit to a chemical test and inform you that your refusal to submit to a chemical test will result in a suspension of your driving privileges for one year. Will you now take a chemical test?

*Abney v. State*, 811 N.E.2d 415, 423 (Ind. Ct. App. 2004). See Ind. Code §§ 9-30-6-1 through 2. Eventually Officers Batts and Burks transported Ballheimer in their police car to a nearby hospital for assistance in performing the chemical testing.

At the hospital, Ballheimer refused to consent to blood and urine screens until he was reminded that refusal would result in his driver's license being suspended. Ballheimer then signed a consent form and a hospital technician drew his blood. A urine

sample was requested, and it is undisputed that he refused to provide a sample. Whether that failure to consent was the result of Ballheimer's refusal to submit, as the Officers say, or of his inability to produce a specimen, as he says. Ballheimer initially consented to be catheterized but revoked that consent when the procedure was explained to him.

There followed a substantial period of time during which Ballheimer "attempted" to provide a urine sample. As noted, the parties dispute whether those attempts were each a sham or the result of a genuine physical inability to produce a sample. Ballheimer eventually collapsed in the hospital bathroom and became unresponsive to Batts's demands for a "yes or no" answer to the question of whether he would consent to be catheterized. Batts and Burks lifted Ballheimer into a chair. When he failed to stand up from his seated position in the chair—whether because he was unable to do so or refused to do so—he was informed that he was under arrest, was handcuffed, and placed in a wheelchair. Batts wheeled Ballheimer back outside to the police car in which they had arrived. In Defendants' words, "Upon arriving at [Burks's] police car, [Ballheimer] did not get into the car as instructed, so [Batts] struck [Ballheimer] in his right thigh with his right knee and [Ballheimer] fell into the seat . . . ." Defs.' Br. Supp. 8.

According to Ballheimer,

> I remember the officer coming around and sitting in the car and looking at me and saying, now we're going to charge you with resisting arrest, so you can't bond out until Monday. And then he shot me the most, like, messed up smile I've ever seen in my life. And, like, at that point, I was legitimately, like, terrified. So I—that's when I tried to get out of the situation by telling them—it somehow got translated into my needing medical help.

Ballheimer Dep. (Dkt. 30 Ex. 4) 110:15–24.

In the meantime, Officer Burks had begun drafting a search warrant application to secure a court order compelling production of Ballheimer's urine. Among other things, Officer Burks's affidavit in support of the application stated that Ballheimer "had refused [to take a chemical test] by not responding." Dkt. 33 Ex. 2, at 2. Ballheimer contends that this was a lie, since Officer Burks himself had observed Ballheimer consent to a blood draw and repeatedly attempt to provide a urine sample. The affidavit further stated that Burks was requesting "a search warrant to be issued to obtain and remove blood or other body fluid sample(s)" from Ballheimer, omitting the fact that the Officers had already obtained a blood sample from him. *Id.* Ballheimer maintains that this omission was intentional and misleading. Officer Batts read and approved Officer Burks's false and misleading affidavit before it was filed. The warrant was issued by the court within an hour following its submission and authorized the officers "to obtain and remove blood or other body fluid sample(s)" from Ballheimer and "to use reasonable force to obtain such sample(s)." Dkt. 33 Ex. 1, at 1.

Batts drove Ballheimer back to the hospital where Ballheimer was administered fluids intravenously for dehydration, and perhaps received a medication as well, causing him to feel "substantially better." Ballheimer Dep. (Dkt. 30 Ex. 5) 123:12. Ballheimer was then allowed one "last chance" to urinate voluntarily, though he did not. *Id.* at 127:4.

> After I couldn't pee, they gave me a few minutes, and then they pretty much said, okay, well, you need to get cathetered now because you have to. And so instead of just arguing with them, I just complied, and I got up on the table, so they wouldn't force me because they've proven that they were going to do whatever they want. They're going to get it however they want to. And that's when the nurse told me to pull down my pants, and then she grabbed my penis and started pushing it in, and it was the worst pain I have ever felt in my life. And she keeps yelling at me, you

can't move. It's kind of hard not to move when I'm feeling like I'm going to vomit the whole time.

Id. at 128:4–17.

Following the successful extraction of the urine, Ballheimer was transported to the county jail, where he wound up remaining for two weeks. The chemical tests revealed the presence of amphetamines, methamphetamine, benzodiazepines, and MDMA in Ballheimer's system. Ballheimer later admitted to having taken methamphetamine and Xanax on July 6, 2016, the day before his arrest, but he denied taking any drugs on July 7, 2016. Following his two weeks of detention, Ballheimer was released on bond to a rehabilitation facility, where he remained for the ensuing five months.

Ballheimer's driver's license was suspended for one year by the Indiana Bureau of Motor Vehicles, but that suspension *appears* to have been vacated sometime thereafter. On September 27, 2017, on a petition for judicial review, the state court judge ( the same judge who had issued the warrant on July 7, 2016) ruled that "probable cause did not exist to believe [Ballheimer] had operated his vehicle in an impaired condition [on July 7, 2016,] and there was no authority to offer [Ballheimer] implied consent." Dkt. 33 Ex. 4, at 5. The State of Indiana public records reveal that the pending criminal charges for operating a vehicle while intoxicated, operating a vehicle with a controlled substance or its metabolite in the body, public intoxication, and resisting law enforcement were dismissed shortly after the judge entered his ruling. *See also* Dkt. 33 Ex. 6, at 1 (order of dismissal). No conviction resulted from this arrest and no other criminal charges were preferred in connection with the July 7, 2016, incident.

## II.     Procedural Background

Ballheimer filed this lawsuit against the officers and the Town on May 2, 2017. On May 2, 2018, the parties filed cross-motions for summary judgment. Defendants sought judgment on Ballheimer's claims in their entirety; Ballheimer's motion sought judgment only with regard to liability on Defendants' claims. We previously granted in part and denied in part Defendants' motion, and denied Ballheimer's, issuing the following findings:

- Both motions were denied without prejudice to refiling for failure to present a decidable issue as to the following: the lawfulness of Defendants' seizure or seizures and the Town's alleged *Monell* liability. We invited renewed motions on these issues "provided they are supported with cogent, coherent briefs addressing the points raised" in our ruling.

- Both motions were denied with prejudice to refiling because of the presence of a genuine dispute of material fact as to the issue of whether Defendants deliberately or recklessly provided the court issuing the warrant with false, material information.[1]

---

[1] Although we denied with prejudice both parties' motions on this issue, the Officers nonetheless ask us to review this decision in light of recent Seventh Circuit precedent clarifying that "the materiality of omitted facts, unlike the materiality of false statements, is properly part of the qualified-immunity analysis." *Rainsberger v.* Benner, 913 F.3d 640, 654 (7th Cir. 2019). But Ballheimer contends that the Officers in applying for the warrant, did not simply omit the fact that Ballheimer had previously submitted a blood sample, they falsely informed the court that Ballheimer had *refused* to submit to chemical tests. This disputed issue, therefore, is not merely an omission, it is also a misrepresentation.

- Defendants' motion was granted with respect to Plaintiff's Fourth Amendment false arrest claim, Fourteenth Amendment claim, and all state-late claims.

The parties accepted our invitation to refile their motions. On July 17, 2019, Defendants filed their supplemental motion for summary judgment; Plaintiff filed his cross-motion on September 5, 2019. Defendants seek summary judgment on all remaining claims against them; Plaintiff seeks summary judgment only on liability.

To recap: Plaintiff has three remaining Fourth Amendment claims: (1) his allegedly unlawful detention in the gas station parking lot; (2) the false justification for the search of his bodily fluids, and (3) the excessive manner in which that search was conducted, *viz. by* forced catherization. Also pending is Plaintiff's *Monell* claim against the Town. For the first time, Plaintiff also challenges the probable cause for his being placed in custody after he failed the field sobriety tests.

## Analysis

### I.    Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences

flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Here, the Court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. *Matsushita*, 475 U.S. at 574.

We note at the outset that, regrettably, the parties' renewed motions suffer from some of the same deficiencies as their earlier attempts to secure summary judgment. We previously critiqued the parties for "treat[ing] their briefs in opposition to summary judgment in favor of the other party largely identically to their briefs in support of summary judgment in their own favor," rather than satisfying the relevant summary judgment burdens imposed on them as movants. [Dkt. 78, at 8]. At various points in their renewed  motions, both sides continue to ignore their respective burdens. As we previously admonished the parties, the court is entitled to require "strict compliance" with Rule 56's summary judgment requirements. That said, we have been able to tolerate these procedural shortcomings on our way to fashioning the decisions that follow.

## II.    Discussion

### A. Section 1983

Title 42 U.S.C. § 1983 imposes liability on "[e]very person" who "subjects, or causes to be subjected" another to the deprivation of federal rights under color of state law.

Defendant Chief of Police Anderson is sued here in his official capacity, which "represents 'only another way of pleading an action against an entity of which an officer is an agent'"—in this case, the Town. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008) (McKinney, J.) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Accordingly, we treat Ballheimer's claims against Anderson as being against the Town.

We begin our analysis with Ballheimer's claims against the Officers before we proceed to address his claims against Anderson and the Town.

### B. Fourth Amendment Claims Against the Officers

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness under all the circumstances, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), limned by balancing the public and private interests at stake in a given state intrusion into personal privacy. *United States v. Hensley*, 469 U.S. 221, 228 (1985).

In analyzing Fourth Amendment seizures, police-citizen interactions are divided into three types. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citing

*United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982)). Applying this framework, progressively deeper intrusions into a citizen's privacy interests require progressively weightier justifications. *See id.* Consensual encounters over which police exercise no control and which are therefore not Fourth Amendment seizures at all require no particularized suspicion to justify them. *Id.* Investigatory stops, or *Terry* stops, which are limited to brief, nonintrusive detentions, require reasonable suspicion of criminality supported by specific, articulable facts. *Id.* Full arrests subjecting an arrestee to a litany of intrusions, *see Utah v. Streiff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting), require probable cause to believe the person is committing or has committed a crime. *Johnson*, 910 F.2d at 1508.

It is critical, therefore, to undertake a careful and accurate preliminary characterization of each police-citizen encounter in order to define the quantum of suspicion necessary to justify the police conduct engaged in at any given moment. *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). Nonseizures may, of course, ripen into seizures, *see Abbott v. Sangamon County*, 705 F.3d 706, 719–20 (7th Cir. 2013), and *Terry* stops may ripen into arrests, *see Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014), so long as the seizure is supported by a sufficient quantum of suspicion. To test the sufficiency of suspicion,  we must view "the facts and circumstances within [a police officer's] knowledge" "at the moment the decision [to seize] was made," disregarding later acquired information, *Qian v. Kautz*, 168 F.3d 949, 953–54 (7th Cir. 1999).  It is similarly important to determine the timeline of events during which a particular encounter occurs and to which the appropriate characterization attaches.

Determinations of probable cause and reasonable suspicion normally are mixed questions of fact and law, but when the facts are undisputed, the ultimate resolution of whether probable cause or reasonable suspicion existed becomes a question of law. *United States v. Carlisle*, 614 F.3d 750, 754, 2010 WL 3155876 (7th Cir. 2010).

1. *Defendants' Detention of Ballheimer in the Gas Station Parking Lot*

Ballheimer does not argue that any Fourth Amendment violations were committed by the Officers during the time period in which they were conducting the "welfare check," up to and including Ballheimer's exit from the ambulance. His first Fourth Amendment claim is that the Officer's lacked the necessary suspicion to detain him and conduct the field sobriety tests once the medics permitted him to leave the gas station parking lot.

The parties agree that this detention constituted a *Terry* stop for purposes of our determining the "quantum of suspicion" necessary for the police action. For the Officers' actions to have been lawful under the Fourth Amendment, they must have had reasonable suspicion supported by specific and articulable facts that Ballheimer was engaging in some unlawful activity. *Matz*, 769 F.3d at 522. "[A]lthough reasonable suspicion is a less demanding standard than probable cause, such a stop requires at least a minimal level of objective justification and the officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* (*internal quotations omitted*). Ultimately, the reasonable suspicion determination is based on "commonsense judgments and inferences about human behavior." *United States v. Maclin*, 313 Fed. Appx. 886, 889, 2009 WL 605944, at *2 (7th Cir. 2009). When making a reasonable

suspicion determination, we must examine the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

For Ballheimer to prevail on this claim, he must establish that the Officers had "no objective justification for the stop," merely "unparticularized suspicion." *See Matz v. Klotka*, 769 F.3d at 522. For the Officers to prevail, they must have had "specific and articulable facts" supporting their reasonable belief that Ballheimer operated his vehicle while intoxicated. There is an abundance of relevant case law to guide the court in making this determination, but surprisingly, neither party cites to any controlling authority or analogous caselaw beyond a few citations articulating boilerplate principles. Defendants, in fact, cite to no legal authorities; Ballheimer cites cases that are plainly distinguishable.[2]

Nevertheless, having conducted our own careful review of applicable case law in light of the parties' contentions, we conclude that, based on the totality of the circumstances, the evidence establishes that the Officers reasonably suspected that

---

[2] *See Mordacq v. State*, 585 N.E.2d 22 (Ind. Ct. App. 1992) (holding that there was insufficient evidence to prove beyond a reasonable doubt that defendant was operating her vehicle while intoxicated merely because she was found passed in the parked, running vehicle). Contrary to Ballheimer's argument, the *Mordacq* court did *not* hold that "merely sitting asleep in a properly parked vehicle with the engine running is not evidence of impaired operation." Instead, it held that this evidence alone was not sufficient to "prove a violation" of impaired operation. Ballheimer's invocation of *Clark v. State*, 611 N.E.2d 181 (Ind. Ct. App. 1993) is similarly problematic. An appellate court holding that there were insufficient facts to sustain a conviction does not transmute into an articulation of the reasonable suspicion standard. Ballheimer also misapplies Indiana Code § 9-30-6-2, which requires chemical tests to be administered within three hours of a suspect's allegedly impaired operation of the vehicle. Ballheimer does not explain how this statute is relevant to our determination of whether reasonable suspicion existed at the time of the *Terry* stop.

Ballheimer had operated his vehicle while under the influence of an illegal substance.[3] Accordingly, they did not commit a Fourth Amendment violation by detaining Ballheimer for the purposes of conducting an investigatory stop.

The undisputed facts adduced here establish that Ballheimer was found unconscious sitting in the driver's side of his vehicle while the engine was running; that Ballheimer told the Officers after they managed to rouse him that he was "on his way home" and had stopped at the truck stop because he "was really tired." The Officers noted that Ballheimer's eyes were glassy and bloodshot; that his speech was slurred; that he responded to their inquiries in the negative when asked if he had any underlying medical conditions; and that Ballheimer stumbled when attempting to walk. These specific, articulable facts were noted by the Officers at the time they detained Ballheimer. Considered as a whole, they sufficiently establish an objective justification for their belief that Ballheimer may have been operating his vehicle while under the influence of a controlled substance.[4]

---

[3] Ind. Code. § 9-30-5-2 provides that operation of a vehicle while intoxicated is a criminal offense. "Intoxication" may be caused by either alcohol or a controlled substance. Ind. Code. § 9-13-2-86. Indiana Code Section 9-13-2-118 defines an operator of a vehicle as "a person, other than a chauffeur or a public passenger chauffeur, who: (1) drives or is in actual physical control of a motor vehicle upon a highway; or (2) is exercising control over or steering a motor vehicle being towed by a motor vehicle."

[4] *See Minett v. Overwachter,* 2020 WL 224342 (W.D. Wis. Jan. 15, 2020) (officers articulated specific facts from which a reasonable officer could infer that an individual had operated a vehicle while intoxicated where the individual was found sitting near a parked vehicle that only he appeared to be associated with and smelled of alcohol, had slurred speech and trouble keeping his balance); *United States v. Lee, 2018 WL 10075927,* at *3 (W.D. Wis. Jan. 17, 2018) (officers had reasonable suspicion that individual was under the influence of an intoxicant or controlled substance when he was found asleep and not easily awakened in a parked, running car with a child in the backseat). *See also Smith v. Ball State Univ.*, 2001 WL 1339006, at *4 (S.D. Ind. Oct. 29, 2001), *aff'd,* 295 F.3d 763, 2002 WL 1456715 (7th Cir. 2002) (officers need not

Accordingly, we hold that the Officers had reasonable suspicion to detain Ballheimer at the car to conduct a brief investigatory stop and the field sobriety tests.[5]

2. *Ballheimer's Arrest*

Ballheimer's failed the field sobriety tests, prompting Officers Batts and Burks to transport him in their police car to a nearby hospital to permit chemical testing to be performed. He was subsequently formally arrested. As we ruled in our prior summary judgment order, the Officers are entitled to qualified immunity for Ballheimer's allegations that they lacked probable cause to arrest him.[6] Ballheimer now claims, however, that prior to his formal arrest, the officers placed him in police custody without possessing the requisite quantum of suspicion. The parties appear to agree that by placing Ballheimer in police custody and transporting him to the hospital, the investigatory stop was no longer brief or nonintrusive, and had ripened into an arrest requiring probable cause. *See Matz*, 769 at 524–25. *Abbott v. Sangamon County*, 705 F.3d 706, 719–20 (7th Cir. 2013). "Probable cause exists if at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has

---

detect the odor of alcohol or locate paraphernalia to have reasonable suspicion that individual may have been drunk or on drugs)

[5] Ballheimer does not challenge the promptness or intrusiveness of this investigatory stop, nor does he challenge the administration of the breathalyzer test.

[6] Our previous summary judgment ruling addressed qualified immunity for the Officers for their seizure of Ballheimer following his failed sobriety tests. Because the Officers have not asserted this defense, however, and because the parties' first round of briefing did not specifically address whether the Officers unlawfully seized Ballheimer when they transported him to the hospital, we will now address the parties' theories on this question.

committed, is committing, or is about to commit an offense." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) (*internal quotations omitted*).

The Officers maintain that Ballheimer's failed sobriety tests provided them with probable cause to arrest him, and that, if probable cause did not exist, they are entitled to qualified immunity. We need not determine whether the Officers had probable cause to arrest Ballheimer in order to conclude that here they are shield by qualified immunity. In this context, qualified immunity protects officers who have "arguable probable cause" to arrest. In other words, it shields those officers who reasonably but mistakenly believe probable cause existed. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008, 2013 WL 3481359 (7th Cir. 2013) ("An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a clearly established constitutional right.").

Ballheimer's failed sobriety tests heightened the Officers' reasonable suspicions, thereby creating arguable probable cause, they say. Arguable probable cause exists when "a reasonable police officer in the same circumstances as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Humphrey v. Staszak*, 148 F. 3d 718, 725 (7th Cir. 1998). According to the Officers, at the time they seized Ballheimer, there was no law clearly establishing that officers, armed with reasonable suspicion that a suspect has operated a vehicle while under the influence of an illegal substance, do not have probable cause to arrest that suspect if he fails the field sobriety tests. Accordingly, the Officers argue, they are entitled to the protections of qualified immunity.

Once this defense has been raised by the Officers, it becomes Ballheimer's burden to overcome it.  *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). In our prior discussion of Ballheimer's claim that the Officers did not have probable cause to arrest him at the hospital, we concluded that the Officers were entitled to qualified immunity, but that determination was based on Ballheimer's failure to carry this burden. We ruled that Ballheimer had simply had "nothing at all to say on qualified immunity for the Fourth Amendment false arrest claim."  Based on our current review of Ballheimer's renewed briefs, though he attempts a response to this defense, we conclude that he has nothing of *value* to say with regard to qualified immunity on his Fourth Amendment false arrest claim. He has provided nothing beyond the mere recitation of boilerplate principles regarding qualified immunity standards, without any explanation as to how those principles apply to his case. From there, he states that he "incorporates herein his foregoing arguments on the lack of reasonable suspicion and probable cause," repeating that it is "clearly established" that police officers are barred from conducting field sobriety tests or from taking individuals into custody "when they have no knowledge of whether [they] had operated a vehicle within the past three hours." Such shallow advocacy does not carry the day or satisfy Plaintiff's legal burden.

In an effort to salvage his claim, Ballheimer again misapplies the holding of *Mordacq v. State*, 585 N.E.2D 22 (Ind. Ct. App. 1992).[7] There, the court held that the state had not proven beyond a reasonable doubt that a criminal defendant had operated a

---

[7] Ballheimer's invocation of *Nichols v. State*, 783 N.E.2d 1210, 1212 (Ind. Ct. App. 2003) and *Clark v. State*, 611 N.E.2d 181 (Ind. Ct. App. 1993) fails for the same reason.

vehicle while intoxicated when it offered little to no evidence that she had driven her vehicle within three hours of the chemical testing that revealed a high level of alcohol in her system. Whether the arresting officers had probable cause to arrest the defendant (who was discovered passed out and reeking of alcohol in the driver's side of her running vehicle) was not disputed in *Mordacq*. This holding, which focused on the burden of proof in a criminal proceeding, does not impose on police officers an obligation to determine when a suspect last operated a vehicle as a condition precedent of probable cause to arrest the person. Ballheimer's continued reliance on this case does not serve to strengthen his arguments. Probable cause plainly does not require "an actual showing" of criminal activity. *United States v. Navarro*, 90 F.3d 1245, 1253 (7th Cir. 1996). By ignoring this legal principle, Ballheimer has again failed to rebut the Officer's qualified immunity defense.

Thus, we conclude that Ballheimer, having failed to sustain his burden in overcoming the Officer's assertion of qualified immunity, entitles the Officers to the protections of qualified immunity from Ballheimer's Fourth Amendment false arrest claim against them.

3. *Plaintiff's Unlawful Search Claim*

Under the Fourth Amendment, warrantless searches are *per se* unreasonable, subject to a few well delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967). The warrant requirement applies with full force "'where [surgical] intrusions into the human body are concerned[,]'" *Winston v. Lee*, 470 U.S. 753, 761 (1985) (quoting *Schmerber v. California*, 384 U.S. 757, 770 (1966)), including, more specifically, in

blood draws, where there is "a compelled physical intrusion beneath [a person's] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). In terms of legal distinctions, there is no justifiable distinction between a compelled physical intrusion beneath a person's skin and the insertion of a catheter into the urethra to obtain a sample of his urine as evidence for a criminal investigation.

In our prior summary judgment ruling, we included several findings and conclusions with respect to the Officer's search:

- The "exigent circumstances" exception to warrant requirement was inapplicable, and therefore the officers required a warrant for the catherization.

- If the warrant was valid, the Officers did not act outside the scope of authorization by taking Ballheimer's urine in addition to his blood. We also noted that, had the Officers raised a qualified immunity defense (they had not), nothing in the warrant would have so unambiguously excluded the possibility of taking both blood and urine samples as to disentitle the Officers from relying on that construction of their own authorization.

- Based on the parties' submission, we could not determine with sufficient reliability whether the search warrant was supported by probable cause. Nor could we determine whether the Officers unreasonably executed the warrant, *viz. the* forced catherization.

We invited renewed motions on the issues of whether the warrant was based on probable cause  and whether the Officers unreasonably executed the warrant. Neither

party has elected to revisit the issue of probable cause, and thus our remaining inquiry

focuses on the reasonableness of the forced catherization. Because Ballheimer "assumes"

that probable cause existed for the warrant, so shall we.[8] We therefore turn to a

discussion of whether the Officers were unreasonable when they executed the warrant.

The Officers assert that their actions to require that Ballheimer submit to the

catheterization performed by the hospital nurse was reasonable. Alternatively, they argue

they are shielded by the doctrine of qualified immunity. The constitutionality of invasive

medical procedures conducted under court order for the purposes of criminal

investigation is determined under the "*Schmerber* balancing test." *Winston*, 470 U.S. at

763. *See, e.g., United States v. Husband*, 226 F.3d 626, 631 (7th Cir. 2000); *Elliott*, 686

F. Supp. 2d at 859. In our prior summary judgment ruling, we admonished the parties for

failing to cite to or apply *Schmerber* or *Winston* in framing their arguments regarding the

constitutionality of a forced catheterization. Now, only Ballheimer has managed to

proffer an analysis that includes a discussion of all three *Schmerber* factors. The Officers

acknowledge the existence of these factors, but include only the third factor in their

---

[8] Ballheimer states that the Court mandated that the parties presume, in the event they submitted
renewed summary judgment motions, that the warrant was not falsely procured and was based on
probable cause. Ballheimer has misinterpreted our directive from the earlier ruling, wherein we
stated that the parties could submit additional briefing on the question of whether probable cause
existed to obtain the warrant, although we barred further submissions with respect to whether the
warrant was falsely procured. These are two distinct inquiries that Ballheimer has improperly
continued to conflate. Moreover, we advised Ballheimer that "any future efforts [] to hold the
Officers liable for conduct under a warrant issued without probable cause would have to
overcome the hurdle of showing that the warrant was so lacking in indicia of probable cause to
render official belief in its existence unreasonable." Ballheimer has now had *two* opportunities to
apply the appropriate standard on this issue and has failed both times to do so. Accordingly, we
deem this argument waived for the purposes of this entry.

analysis. Of greater concern, however, is the fact that they never responded to Ballheimer's arguments regarding these factors.

The *Schmerber* balancing test analyzes the reasonableness of a medical procedure pursuant to the following factors: (1) "the extent to which the procedure may threaten the safety or health of the individual"; (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"; and (3) "the community's interest in fairly and accurately determining guilt or innocence." *Husband*, 226 F.3d at 631 (*quoting Winston*, 470 U.S. at 763.). We address each of these factors in turn below.

The first *Schmerber* factor, the extent to which the procedure may threaten the safety or health of the individual, prompted Ballheimer to proffer the report of his expert witness, Dr. Steven Smith, in arguing that an in-and-out catheterization should only be performed "when the appropriate medical indications for doing so exist." Additionally, before a catheterization is performed, medical history should be obtained from the individual, and the risk of potential complications of that procedure should be discussed with the individual. Following the completion of the catheterization, a health care provider should evaluate the individual for any immediate complications and should advise the individual about signs and symptoms of potentially delayed complications.

None of these protections were undertaken in Ballheimer's case. He was not examined by a doctor nor was his medical history taken. The risks of the procedure were never communicated to him and no discussion followed the procedure advising him of delayed complications. However, Dr. Smith opines that the insertion of a catheter is not an unusual or particularly dangerous procedure. Notwithstanding this fact, because

Ballheimer had already produced a blood sample, he argues that the forced catheterization unnecessarily threatened his health. The Officers offer no rebuttal; thus we find that this factor weighs in Ballheimer's favor.

Next we consider the extent to which the procedure represented an intrusion upon Ballheimer's dignitary interests. Ballheimer states that the loss of personal dignity associated with "putting a catheter into a man's penis and then into his bladder," cannot be justified "in the name of efficacy and locality" "when a blood draw is more accurate and reliable." The Officers again do not respond to these averments, presumably conceding that one's dignitary interests are clearly intruded upon when his pants are pulled down, exposing his genitalia, and he is then subject to the painful insertion of a catheter into his penis. We thus conclude that the use of the catheter constituted a significant invasion of Ballheimer's personal privacy and bodily integrity. *Elliott v. Sheriff of Rush Cty., Ind.,* 686 F. Supp. 2d 840, 859, 2010 WL 679065 (S.D. Ind. 2010).

Finally, we weigh "against these individual interests … the community's interest in fairly and accurately determining guilt or innocence." *Winston*, 470 U.S. at 762. The Officers' arguments center on the importance of their being able to obtain urine samples as part of their investigation and prosecution of individuals who are driving while impaired. According to the Officers, while blood testing is an effective toxicology tool to confirm the presence of alcohol, urine testing more efficaciously confirms the presence of other substances in a person's body. The ability to test urine thus serves the public's interest in ensuring that drivers impaired by substances other than alcohol are appropriately penalized and deterred from future offenses. Additionally, because Indiana

law provides only a three-hour window from the point in time when the individual operated a vehicle and the administration of chemical testing of the suspect's fluid, officers seeking to have this test performed are faced with a time exigency. As the Officers explain, "If catheterization is off the table, all a suspect will have to do in situations like the present case [is] wait three hours and they would be in the clear." Ballheimer responds, again relying on his expert, that analysis of blood is "more reliable, accurate, and scientifically valid method of determining both impairment and intoxication due to . . . the use of a controlled substance or the excessive consumption of [alcohol.]"

The Officers do not challenge the opinions of Ballheimer's expert, nor do they cite any reason for requiring the urine sample in addition to Ballheimer's already furnished blood sample. They argue "efficiency," but do not specifically argue that they were in need of expeditious toxicology results.  More critical to our analysis is the fact that they have failed to explain the reason they required earlier confirmation of the substances Ballheimer may have ingested than they would have obtained from the blood sample. The Indiana's three-hour rule merely requires that a chemical screening be administered within three hours; it does not mandate that toxicology results be retrieved within three hours.  Here, because Ballheimer's blood had already been drawn by the time the catherization was administered,  we cannot conclude that the public interest factor, properly weighed, redounds in favor of the Officers, particularly when they have offered no arguments to rebut Ballheimer's claim that his guilt or innocence could have been as readily determined by virtue of his blood sample.

Our analysis of the *Schmerber* factors has included a review of the few decisions of those courts who have also addressed the reasonableness of forced catheterizations, although we note that our research has disclosed no decision involving the precise question presented to us here.  We summarize those holdings below.

*Lockard v. City of Lawrenceburg* is the most closely analogous case to Ballheimer's within our Circuit.[9]   In *Lockard*, police officers received a warrant "authorizing and ordering" them to obtain blood and urine samples from the plaintiff by all "necessary and proper means." The police officers directed the forced catheterization of the plaintiff after plaintiff had provided his blood sample "but was either unwilling or unable to provide a urine sample." The officers felt that, because the warrant ordered the retrieval of both specimens, that they were obligated to obtain the urine sample. *Lockard v. City of Lawrenceburg, Ind.*, 815 F. Supp. 2d 1034, 1037-38, 2011 WL 3902796 (S.D. Ind. 2011).

The *Lockard* court distinguished the facts of that case from those of *Elliot v. Rush*, 686 F. Supp. 2d 840 (S.D. Ind. 2010). In *Elliot*, police officers obtained a warrant authorizing them to obtain professional medical assistance to obtain "a blood or urine sample" from the plaintiff and to use "reasonable force to do so." The officers then obtained blood and urine from the plaintiff, utilizing a forced catheterization for the latter following the plaintiff's failed attempts to urinate. The *Elliot* court focused on the scope of the warrant in finding the officers had acted unconstitutionally when they seized both

---

[9] Even looking beyond our Circuit, we were unable to locate a case comparable to ours.

urine and blood from the plaintiff.[10] The *Lockard* court concurred in the *Elliot* analysis,

relying on the fact that the warrant in its case authorized blood "and" urine, as opposed to

blood "or" urine in the *Elliot* case.

The *Lockard* court nevertheless refrained from deciding whether the Officers'

actions were constitutional, concluding instead that qualified immunity for the officers'

conduct applied and was dispositive of the case.  Noting what it described as the

"diverging patchwork of well-reasoned cases," the Court concluded that the officers had

not violated a "clearly established" right.  It further held that the issue was not so obvious

that a reasonable officer would know that a forced catheterization would violate the

plaintiff's constitutional rights.

Lacking clear precedent from other courts,  the *Schmerber* factors alone must

guide our analysis. We hold that each of these factors favors Ballheimer.  Ballheimer's

already furnished blood sample at the time of the forced catherization would have

satisfied the public interest thus avoiding any compromise to his health or unnecessary

intrusions on his dignity.  The Officers provide no justification for their need to procure

Ballheimer's urine in addition to his already acquired blood sample, nor have they

mustered any arguments to address the potential harms to his physical or personal well-

---

[10] In our prior summary judgment ruling, we distinguished our case from the *Elliot* case based on the issue of "scope."  As we explained: "Elliott held that police officers exceeded the scope of a warrant authorizing them to obtain 'a sample of Plaintiff's blood or urine . . . by requiring Plaintiff to give a urine sample after Plaintiff had already provided a blood sample.' There, however, both blood and urine samples were taken pursuant to the warrant. Here, by contrast, the blood sample had already been taken by consent at the time the warrant issued. Even if the warrant's 'or' was exclusive, the Officers complied with it by taking only Ballheimer's urine sample under its auspices." [Dkt. 78, at 20-21] (*internal citations omitted*).

being. The Officers were constitutionally authorized to use "reasonable force" to seize Ballheimer's bodily fluids, but they stop short of justifying the forced catheterization as reasonable under these circumstances.

We caution, however, that this determination is limited to the specific circumstances of this case. Evidence of a need for an immediate urinalysis or the deficiencies inherent in a blood sample might change the analysis and the conclusion we have reached here. We do not speculate regarding other potential variations on the facts before us. Our ruling applies only here on the evidence presented by the parties to this litigation.

That said, we also conclude that the individual officers who have been sued here for this constitutional violation are entitled to qualified immunity.[11] As previously noted, qualified immunity shields public officials exercising their discretionary powers and sued in their personal capacities—as the Officers here—from the burdens of litigation under Section 1983 unless their conduct violated "a clearly established . . . constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity analysis poses two questions: (1) whether a defendant violated a constitutional right, and (2) whether the right was clearly established at the

---

[11] This determination hinges on the assumption that the warrant authorizing the Officers to obtain Ballheimer's urine was properly obtained from the state court judge who issued it. If the warrant was not properly procured, the Officers cannot find protection under qualified immunity for violating Ballheimer's clearly established right against a warrantless, intrusive medical search. *Winston v. Lee*, 470 U.S. at 754.

time of the violation. *Id.* (citing *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012)). These questions may be addressed in either order. *Id.* (citing *McComas*, 673 F.3d at 725). "If a defendant asserts that she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim." *Archer v. Chisholm*, 191 F. Supp. 3d 932, 943 (E.D. Wis. 2016) (citing *Betker*, 692 F.3d at 860). The doctrine of qualified immunity, as applied here, means that the Officers can only be held liable only if, at the time of the catherization,  Ballheimer had a clearly established right not be subjected to forced catheterization despite a warrant so authorizing.[12]

The phrase  "clearly established" cannot be defined at a high level of generality. *City of Escondido, Cal. V. Emmons*, 586 U.S. ___, 139 S.Ct. 500, 503. (2019). As the Supreme Court has explained, "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the situation the officer confronts." *Id. (quoting Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018)). Thus, the Supreme Court has instructed lower courts to "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *Escondido, Cal. V. Emmons*, 139 S.Ct. at 503 (*quoting D.C. v. Wesby*, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)).

Like the *Lockard* court, we recognize the "diverging patchwork" of precedent on the subject of forced catheterizations. *Lockard*, 815 F. Supp. 2d at 1034. (*collecting*

---

[12] As the *Lockard* court confirmed, a catheterization is the only means by which Officers can obtain urine from an unwilling or incapable suspect. *Lockard*, 815 F. Supp. 2d at 1047.

*cases*). *See Levine v. Roebuck,* 550 F.3d 684 (8th Cir.2008) (Fourth Amendment rights of prisoner were violated when he was catheterized as a part of random drug screening), *Sparks v. Stutler,* 71 F.3d 259, 261 (7th Cir.1995) (forced catheterization without warrant violated prisoner's Fourth Amendment rights); *Elliott*, 686 F. Supp. 2d at 863 ("This case falls into the 'obvious' category. A reasonable law enforcement officer should have known that ordering Plaintiff to submit to a medical catheterization, against his will and without the issuance of a search warrant . . . was an unreasonable search.") Indeed, there is a dearth of case law evaluating whether police officers act unconstitutionally when they direct a forced catherization pursuant to a warrant. Thus. we are unable to locate a "closely analogous case" that would have placed these Officers on notice of their unconstitutional conduct.

While Ballheimer repeatedly asserts that *Elliot* establishes that a forced catheterization violates a clearly established constitutional right, this reading misconstrues that decision, as we explained in our previous summary judgment ruling. The holding in *Elliot* was premised on the fact that the Officers acted beyond the scope of a valid warrant. Here, our analysis includes the fact that the Officers acted within the parameters of presumptively valid warrant. As we have held, in forcing the catheterization of Ballheimer, the Officers acted unreasonably and therefore unconstitutionally, but qualified immunity saves them from liability because it "gives ample room" for their mistaken judgments. *Hunter v. Bryant*, 502 U.S. 224, 229, (1991).

We add this note as well to our discussion: the absence of a closely analogous case is not necessarily fatal to Ballheimer's claim if he were able to show that the

violation of his rights was so obvious that a reasonable state actor would have understood that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000). (Analogous case law is not always required because "in the most extreme cases, an analogous case might never arise because the existence of the right was so clear . . . that no one thought it worthwhile to litigate the issue.").  Ballheimer argues that "the lack of case law directly on point supports the proposition that state actors are not conducting forced catheterizations because it is obvious that such actions are unreasonable."

Ballheimer's argument has its appeal, but we do not agree that the unconstitutionality of the Officers' conduct was so obvious as to place the lawfulness of their actions "beyond debate," placing them beyond the protections of qualified immunity. *Escondido*, 139 S.Ct. at 503. Despite the shortage of case law directly on point with respect to the constitutionality of the Officer's actions,  there is no shortage of case law granting police officers qualified immunity for utilizing forced catheterizations to secure evidence of this kind. *See Levine v. Roebuck*, 550 F.3d  at 684 (officers who committed Fourth Amendment violation by unlawfully catheterizing prisoner were entitled to qualified immunity); *Sparks v. Stutler,* 71 F.3d 259, 261 (7th Cir.1995); (same); *Ellis v. Cotten*, 2008 WL 4182359 (N.D.Tex. Sept. 9, 2008) ("Even if Defendant violated Plaintiff's Fourth Amendment rights, he would still be immune from suit" because taking blood and urine samples are "proper method[s] of seizing evidence for a person suspected of committing an intoxication offense.") This issue takes law enforcement officers no less than courts into "nebulous territory."   Thus, the officers

cannot fairly be held liable for their "bad guesses in gray areas." *Lockard*, 815 F. Supp. 2d at 1051.

C. **Municipal Liability**

Although as we have determined  the Officers are shielded from liability for their unconstitutional conduct, the Town may still be subject to *Monell* liability. *Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 169 F. Supp. 3d 867, 876 (C.D. Ill. 2016). Plaintiff so claims. The Town resists.

We begin by noting the barebones-ness of Ballheimer's argument on the question of *Monell* liability.  His primary assertion with respect to his *Monell* claim is that summary judgment should not be granted for the Town.  This plainly falls short of establishing a basis for holding as a matter of law that he should prevail on this claim. We therefor turn our attention only to the issue of whether the Town is entitled to summary judgment on the claims against it based on *Monell*.

It is well-settled that § 1983 does not allow "for a local government to be sued . . . for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001). To successfully maintain a § 1983 action against a local government, a plaintiff must demonstrate the existence of an unconstitutional policy. "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403–04 (1997). Such a

policy can take one of three forms: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) an allegation that constitutional injury was caused by a person with final policy-making authority." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003).

Ballheimer alleges the existence of a widespread custom within the Town of unconstitutionally utilizing forced catheterizations to obtain urine samples from suspects. No "bright-line" rule defines a widespread custom or practice, but a plaintiff generally "must introduce evidence that acquiescence on the part of the policymakers was and amounted to a policy decision." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016); *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). "There is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance or even three." *Thomas*, 604 F.3d at 303 (*internal citations omitted*); *see also Rodriguez v. Milwaukee Cty.*, 756 F. App'x 641, 643 (7th Cir. 2019), *reh'g denied* (Mar. 25, 2019).

The Town argues that the evidence establishes that no such custom or practice existed. While Officer Batts testified that he directed the use of forced catheterizations, executed pursuant to warrants authorizing reasonable force to obtain urine, on "several occasions,"[13] there is no evidence that Chief Anderson was aware of the technique

---

[13] Officer Batts could not confirm the number of occasions.

employed before Officer Batts. In fact, Chief Anderson unequivocally testified that he was not aware. Officer Batts testified to the opposite effect, but both he clarified that Chief Anderson would only become aware of the forced catheterizations (absent an explicit conversation on the subject, which both Chief Anderson and Officer Batts deny occurring) by reading the corresponding matter's incident report. However, Chief Anderson does not always read incident reports, and he denies doing so in any case where a forced catheterization may have been used.  Chief Anderson maintains that he had no knowledge that officers may be utilizing this practice.

According to the Town, this evidence establishes that any forced catheterizations were "isolated" occurrences.  We disagree that this evidence forecloses finding that a widespread custom or practice existed. Officer Batts testified that he has utilized forced catheterizations in similar circumstances on "several" occasions. We are without even a ballpark estimate as to what "several" means. Three? Ten? Fifty? Without even slight quantification as to how often the unconstitutional conduct occurred, we cannot conclude that the violations occurred on fewer than the minimally required "one or three instances" as discussed in the case law is necessary to establish a widespread custom. Additionally, the Town has not presented any evidence as to whether other officers were partaking in this conduct. Officer Batts's testimony that he "did not know" if his fellow officers utilized this technique does not establish as an evidentiary matter that it was not an ongoing practice, as the Town apparently believes.

The Town next argues that Ballheimer cannot prevail because Chief Anderson did not actively participate in the deprivation. To its detriment, the Town never addresses the

proper legal principles in assessing the its culpability by virtue of Chief Anderson. The relevant question, overlooked by both parties, is whether Chief Anderson was "deliberately indifferent" as the "known or obvious consequences" of his actions. Deliberate indifference, in the context of a widespread practice theory, means "a reasonable policymaker [would] conclude that the plainly obvious consequences of [his] actions would result in the deprivation of a federally protected right." *Gable v. City of Chicago*, 296 F.3d 531, 536 (7th Cir. 2002) (*quoting Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997); *Brock v. Casteel*, No. 1:13-CV-01577-DML, 2015 WL 3439236, at *9 (S.D. Ind. May 28, 2015); *Hall v. City of Chicago*, No. 12 C 6834, 2012 WL 6727511, at *6 (N.D. Ill. Dec. 28, 2012). These consequences may be plainly obvious when one knows or should know of their existence. *Wilson v. Cook Cty.*, 742 F.3d 775, 781 (7th Cir. 2014).

"The question of whether the defendants' conduct constituted deliberate indifference is a classic issue for the fact finder." *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998). We cannot determine whether the evidence is so pervasive that it forecloses a reasonable jury from finding that the Town acted deliberately indifferently when it has failed to apply the relevant legal standards. We also note that the Town fixates on Sheriff Anderson's purported lack of actual knowledge without ever addressing the fact that the determination of "conscious disregard" is not limited to consideration of only his actual knowledge. *See Wilson*, 742 F.3d at 781; *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012); *Elliott*, 686 F. Supp. 2d at 867. One of Sheriff Anderson's reporting officers utilized the forced catheterizations on numerous occasions,

which were documented in his incident reports. That same officer testified that he discussed doing so with other lieutenants.[Dkt. 48-6, at 84]. Based on this evidence, a reasonable juror is not barred from finding that Sheriff Anderson should have known of the violations irrespective of what he actually knew.

Finally, we will not grant the Town's motion with respect to Ballheimer's "failure to train" argument. The Town conclusively states that Ballheimer has not shown that a failure to train was the moving force behind the constitutional deprivation. The Town again fails to 1) satisfy its burden of establishing that a reasonable jury is foreclosed from finding that a failure to train was the moving force behind the constitutional deprivation and 2) address or apply the relevant legal principles of the failure to train doctrine. *See Palmquist v. Selvik*, 111 F.3d 1332, 1347 (7th Cir. 1997).

<u>CONCLUSION</u>

Defendants' Motion for Summary Judgment [Dkt. 87] is **denied in part and granted in part.** Defendants' motion is **granted in full** with respect to the individual defendants, but denied with respect to the *Monell* claim. Plaintiff's Motion for Summary Judgment [Dkt. 93] is **denied.**

IT IS SO ORDERED.

Date:     3/20/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William W. Barrett
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
wbarrett@wbwlawyers.com

Toni M. Everton
WILLIAMS BARRETT & WILKOWSKI, LLP
teverton@wbwlawyers.com

Stephen G. Gray
ATTORNEY AT LAW
misstuffy@aol.com

Kirk A. Horn
MANDEL HORN, P.C.
khorn@mhmrlaw.com

Daniel J. Paul
WILLIAMS HEWITT BARRETT & WILKOWSKI LLP
dpaul@wbwlawyers.com

Joshua J. Rauch
MANDEL HORN, P.C.
jrauch@mhmrlaw.com

Todd L. Sallee
TODD SALLEE LAW
toddsalleelaw@yahoo.com